In re Charles P. KLIPFER, Jr.,
Cynthia A. Klipfer, Debtors.

MIAMI VALLEY PRODUCTION
CREDIT ASSOCIATION,
Plaintiff,

v.

Charles P. KLIPFER, Jr., et
al., Defendants.

Bankruptcy No. 3–83–01596.
Adv. 3–83–0722.

United States Bankruptcy Court,
S.D. Ohio, W.D.

June 2, 1986.

John P. Petzold, Dayton, Ohio, for respondent, Angelo Hliaras.

Ronald D. Keener, Lebanon, Ohio, for debtors.

John T. Ducker, Dayton, Ohio, for Farmersville Feed & Grain.

William D. Forbes, Miamisburg, Ohio, for Norris Sears & Sons Grain.

William MacBeth, Dayton, Ohio, for Roger Wright.

George W. Ledford, Englewood, Ohio, Trustee.

Ray A. Cox, Dayton, Ohio, for movant.

## DECISION AND ORDER

WILLIAM A. CLARK, Bankruptcy Judge.

This matter is before the court, after a trial and memoranda of counsel, upon the complaint of Miami Valley Production Credit Association ("PCA"), which alleges that the Chapter 13 debtors, Charles P. Klipfer, Jr. and Cynthia A. Klipfer, wrongfully disposed of crops, which were subject to a security interest in favor of PCA, by selling the crops to two grain elevators without remitting the proceeds of sale to PCA. PCA further alleges that these proceeds were used by the debtors to pay rent to certain landlords of the debtors for the use of farm acreage. In its amended complaint PCA requests the following relief:

1) That the debtors' proposed Chapter 13 plan be modified in conformity with the allegations set forth in PCA's complaint;

2) That the debtors be required to pay over to PCA any and all proceeds from the sale of the crops;

3) That the "court enter an order declaring the respective rights of Plaintiff and Defendants Charles P. Klipfer, Cynthia A. Klipfer, Norris Sears and Sons Grain, Farmersville Feed and Grain, Roger Wright, Ronald Lake, Angelo Hliaras, Michael Buschur, Charles Pelkington, and George W. Ledford."

## FACTS

The following facts have been established either by stipulations or testimony during the trial of this matter.

On June 21, 1982 the debtors, Charles P. Klipfer, Jr. and Cynthia A. Klipfer, executed a note in favor of PCA in the amount of $35,224.18. Of this amount, $12,800.00 was advanced to the debtors for their operating expenses during 1982; the balance of the note represented a renewal of the debtors' previous indebtedness to PCA. The debtors also executed a security agreement in favor of PCA, which purported to grant PCA a security interest in "all growing crops and all harvested crops." In addition, the debtors signed a loan agreement whereby they agreed that any proceeds from the sale of grain or livestock would be in the form of joint checks, payable to PCA and the debtors. The agreement also required that sales of the debtors' crops be made at three specific elevators.

Prior to obtaining their loan from PCA, the debtors had made arrangements to lease farm land from five individuals. The testimony at trial was primarily concerned with only two of the leases.

On December 31, 1981, Charles Klipfer negotiated a written lease with defendant Angelo Hliaras, whereby Mr. Klipfer agreed to pay a land rental of $16,900.00 ($130 per acre). This lease was not recorded. On the day the lease was signed Mr. Klipfer issued a check in the amount of $1000.00. The check was drawn on a checking account comprised of income from the sale of hogs and other income. On May 1, 1982 Mr. Klipfer gave Mr. Hliaras a check for $5,300.00, which was written on the same checking account. On October 16, 1982 another check for $5,300.00 was given to Mr. Hliaras by Mr. Klipfer. The funds in Mr. Klipfer's checking account at this time contained some of the proceeds from the sale of 1982 crops. On October 18, 1982 a final check for $5,300.00 was delivered to Mr. Hliaras. This check, however, was signed by Mr. Klipfer's brother and was drawn on a checking account belonging to the brother. (The check represented a loan from Mr. Klipfer's brother.)

Mr. Klipfer also had an oral lease with defendant Roger Wright to rent land for $2,530.00 ($115 per acre). On October 27, 1982 two checks totaling $1,457.82 were issued to Roger Wright by defendant Norris Sears and Sons Grain as a result of Mr. Klipfer's sale of crops to the grain company. On October 30, 1982 a check in the amount of $889.12 was issued to Roger Wright by defendant Farmersville Feed and Grain. Previously Mr. Klipfer had delivered crops to this grain elevator with instructions that half of the crops be placed in Mr. Wright's name and marked "to be sold." The other half was placed in Mr. Klipfer's name "for storage" and Mr. Klipfer subsequently withdrew this grain to feed livestock. The check to Mr. Wright represented the proceeds of the sale of the crops placed in his name.

Most of Mr. Klipfer's crop was sold to Norris Sears and Sons Grain, despite the fact that this grain company was not one of the three elevators listed on the loan agreement with PCA as a permissible selling point. Margie L. Erisman, a former bookkeeper for Norris Sears and Sons Grain, testified that all checks drawn as a result of the sale of Mr. Klipfer's crops were issued in the name of Charles Klipfer only. (One check, however, listed Roger Wright as the payee.) The checks were written in the manner Charles Klipfer requested. However, she also testified that she requested Tom Sears to contact PCA to determine whether the checks should be written in the joint names of PCA and Charles Klipfer. Thomas Sears, the assistant manager of Norris Sears and Sons Grain, testified that he called PCA and spoke with Sue Sparks, secretary of that particular PCA office. He asked whether Mr. Koeller, the assistant manager, or Mr. Bowers, the manager, was in the office. Ms. Sparks informed him that neither Mr. Koeller nor Mr. Bowers' was there. When asked whether PCA wanted joint checks to be issued, Ms. Sparks informed Mr. Sears that she would have to call him back. Later, Ms. Sparks called Mr. Sears and informed him he could issue a check to Charles Klipfer. Mr. Bowers, the office manager of PCA, testified that Sue Sparks informed him that someone from Sears had called requesting information about how to make

out the checks regarding the sale of Mr. Klipfer's crops. Mr. Bowers did not return the call from Thomas Sears. Neither Mr. Koeller, a former employee of PCA, nor Ms. Sparks, a present employee of PCA, testified at the trial.

Mr. Duane Denlinger, who is the vice-president and general manager of Farmersville Feed and Grain, testified that Mr. Klipfer delivered crops to Farmersville Feed and Grain with instructions that one-half of the crops should be placed in the debtor's name "for storage" and one-half in Roger Wright's name "for sale." During 1982 no checks were made directly payable to Charles or Cynthia Klipfer. The debtors' grain was withdrawn to feed livestock. However, Roger Wright's grain was sold and a check was made out to Mr. Wright. Mr. Denlinger testified that Farmersville Feed and Grain had no record of the relationship between Mr. Klipfer and Mr. Wright.

From the testimony at trial it is clear that neither Norris Sears and Sons Grain nor Farmersville Feed and Grain examined the records of Montgomery County for security interests in the crops of the debtors.

## CONCLUSIONS OF LAW

### I. MOTION OF FARMERSVILLE FEED AND GRAIN

Prior to trial, defendant Farmersville Feed and Grain filed a motion pursuant to FED.R.CIV.P. 12(b) requesting that it be dismissed as a party on the ground that plaintiff's amended complaint fails to state a claim upon which relief can be granted.

With regard to Farmersville Feed and Grain, the amended complaint simply alleges that plaintiff had a security interest in the debtors' crops, and that some of the crops were sold to Farmersville Feed and Grain in violation of plaintiff's rights. Although the amended complaint does not specifically allege that Farmersville Feed and Grain converted the crops or has proceeds of the crops in its possession, the pleadings must be liberally and broadly construed. "The form of the complaint is

not significant if it alleges *facts* upon which relief can be granted...." *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 604 (5th Cir.1981) (Emphasis Supplied).

It does not appear "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

■ Under the facts alleged it is conceivable that plaintiff could establish a right to trace proceeds or a claim of conversion. Plaintiff is entitled to offer evidence in support of its claims and the motion of Farmersville Feed and Grain is therefore DENIED.

### II. VALIDITY OF SECURITY AGREEMENT AND FINANCING STATEMENT

In his post-trial memorandum of law, defendant Roger Wright asserts that the security interest of plaintiff, PCA, is unenforceable because of PCA's noncompliance with OHIO REV.CODE § 1309.14 [U.C.C. § 9–203]. That section essentially provides that a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless 1) the collateral is in the secured party's possession or the debtor has signed a security agreement which describes the collateral; 2) value has been given; and 3) the debtor has rights in the collateral. When a security interest covers crops growing or to be grown, an additional requirement is necessary to create a valid security interest. The security agreement must contain "a description of the land concerned."

An examination of the security agreement signed by the debtors purports to grant a security interest to PCA in "All growing crops and all harvested crops." Also appearing on the security agreement is the following printed phrase: "The crops are located on the following described real estate." No description of any real estate

follows this phrase nor does a description appear elsewhere in the document.

■ Because of the complete omission of a description of the real estate upon which the crops were to be grown, PCA did not comply with the mandatory requirements of OHIO REV.CODE § 1309.14 [U.C.C. § 9–203] and, therefore, its security interest did not attach to the debtors' growing crops. *See, Scott State Bank v. Tabor Grain Co.,* 34 U.C.C.Rep.Serv. 1759, 109 Ill.App.3d 858, 65 Ill.Dec. 381, 441 N.E.2d 173 (Ill.App.Ct.1982); *In re Mount,* 5 U.C. C.Rep.Serv. 653 (Bankr.S.D.Oh.1968).

■ It is also evident that the financing statement filed by the plaintiff was defective as to growing crops. Ohio law has very specific requirements regarding the information that must be contained in a financing statement in order to perfect a security interest in crops growing or to be grown:

A financing statement covering crops growing or to be grown ... must show that it covers this type of collateral, must recite that it is to be indexed in the real estate records of the county in which the real estate is situated, and the financing statement must contain a description of the real estate sufficient if it were contained in a mortgage of the real estate to give constructive notice of the mortgage under the law of this state. If the debtor does not have an interest of record in the real estate, the financing statement must show the name of a record owner or record lessee. OHIO REV.CODE ANN. § 1309.39(E) (Page Suppl. 1984).

In the instant matter, not only is there a complete omission of the descriptions of the lands upon which the debtors' crops were to be grown, but none of the names of the record owners of the real estate appears on the financing statement.[1]

Even if PCA's security agreement had previously attached, the failure to comply with OHIO REV.CODE § 1309.39(E) pre-

vented PCA from perfecting its security interest in the growing crops. *See, In re Herbolsheimer,* 63 B.R. 118, 40 U.C.C. Rep.Serv. 1565 (Bankr.E.D.Mich.1985); *Chanute Production Credit Assn. v. Weir Grain Supply, Inc.,* 10 U.C.C.Rep.Serv. 1351, 210 Kan. 181, 499 P.2d 517 (1972); *First National Bank of Atoka v. Calvin Pickle Co.,* 12 U.C.C.Rep.Serv. 943, 516 P.2d 265 (Okla.1973).

During the trial, counsel for PCA asserted that PCA is claiming a security interest in harvested crops of the debtors and not growing crops. Does this distinction obviate the requirement of including a description of the real estate in the security agreement and the financing statement?

*In re Roberts,* 38 B.R. 128 (Bankr.Kan. 1984), is the only reported case we have located which directly addresses a "growing crops/severed crops" distinction. In that case, as here, neither the security agreement nor the financing statement contained a description of the real estate. The court found that as to "growing crops," the creditor did not have a perfected security interest, but once the crops were severed, the creditor obtained a perfected security interest.

The basic thrust of *Roberts* is contained in the following passages:

As alluded to by the commentators and as delineated in the UCC, only a security interest in "growing crops" must be perfected by a financing statement containing a description of the real estate. It would appear that a security interest in other subcategories of "farm products," such as severed crops, stored crops, or products of crops in their unmanufactured state, is, by negative implication, perfected without inclusion of a real estate description.

The Court holds that severed crops are not "growing crops", but rather are simply another subcategory of the UCC's generic collateral category of farm products, if in the farm debtor's possession.

---

1. One description of real estate does appear on the financing statement. No evidence was introduced at trial regarding this description. We

assume the description is connected with the debtors' residence. No evidence was introduced to establish that any crops were grown there.

Because severed crops are not growing crops, the real estate description requirement of K.S.A. § 84–9–402(1) is inapplicable, and in order to perfect a security interest in the severed and stored crop a financing statement does not have to contain a description of the real estate. *Id.* at 132–133.

■ The opinion is thoughtfully written, conceptually sound and highly persuasive. We, therefore, apply its rationale to the instant proceeding and find that although PCA held an unperfected security interest in the growing crops of the debtors, upon severance of the crops, the security interest of PCA became perfected and enforceable.

Admittedly, complications in lien priority might arise because of the period of time between the unperfected security interest in growing crops and perfection in the farm products of the debtor, but as recognized by the court in *Roberts* "[t]hough this gap in perfection could be a problem under certain circumstances, those circumstances do not exist here." *Id.* at 134.

### III. WAIVER OF SECURITY INTEREST

■ The evidence presented at trial clearly demonstrated that PCA expressly "waived" its lien regarding the transactions that took place at Norris Sears and Sons Grain.

OHIO REV.CODE § 1309.25(B) [U.C.C. § 9–306(2)] provides that "a security interest continues in collateral notwithstanding sale, exchange, or other disposition thereof *unless* the disposition was *authorized* by the secured party in the security agreement *or otherwise*, and also continues in any identifiable proceeds including collections received by the debtor." [Emphasis Supplied].

"The question of whether a sale of collateral is authorized by the secured party is a question of fact...." *Benson County Co-operative Credit Union v. Central Livestock Assn, Inc.,* 31 U.C.C.Rep.Serv. 300, 307, 300 N.W.2d 236 (N.D.1980). *Accord: Lisbon Bank & Trust Co. v. Murray,* 12 U.C.C.Rep.Serv. 356, 206 N.W.2d 96 (Iowa 1973); *In re Ocean Electronics Corp.,* 22 U.C.C.Rep.Serv. 1270 (Bankr.S.D.Cal.1977).

"It appears that there is no question that terms and conditions in security agreements can be expressly waived." *Anon, Inc. v. Farmers Production Credit Assn. of Scottsburg,* 35 U.C.C. 1383, 1388, 446 N.E.2d 656 (Ind.Ct.App.1983).

In the instant matter, Thomas Sears, the assistant manager of Norris Sears and Sons Grain, contacted the office of PCA to determine how the checks for the sale of the debtors' crops should be made out. Sue Sparks, an employee of PCA, informed Thomas Sears that joint checks were not necessary and that the checks could be issued in the names of Charles Klipfer. Mr. Herman Bowers, who was the office manager of the New Lebanon PCA office, testified that Sue Sparks had informed him that someone from Norris Sears and Sons Grain had called the office requesting information about how to make out the checks regarding the sale of Charles Klipfer's crops. Yet, Mr. Bowers did not return the call of Norris Sears and Sons Grain. Nor did he contact the debtor. We find the testimony of Thomas Sears to be highly credible and unrefuted by any testimony offered by PCA. Therefore, we hold that PCA expressly waived any purported security interest in the crops sold to Norris Sears and Sons Grain.

■ Despite the waiver of its lien in the crops sold to Norris Sears and Sons, such waiver did not in and of itself, destroy PCA's lien in the proceeds Charles Klipfer received from PCA.

[I]f the secured party has given his consent or authorization, the collateral when sold or otherwise transferred is free of the claims of the secured party although the interest of the secured party continues in any identifiable proceeds of the sale, including proceeds in the hands of the debtor. *Vacura v. Haar's Equipment, Inc.,* 40 U.C.C.Rep.Serv. 1493, 1499, 364 N.W.2d 387 (Minn.1985).

■ However, in the instant matter the debtors no longer have the proceeds from

the sale of crops to Norris Sears and Sons Grain. Those funds were commingled with other funds in a checking account and checks were written to pay rent to various landlords. At this point PCA lost its ability to trace the proceeds:

> Where cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business, recipients of the funds of course take free of any claim which the secured party may have in them as proceeds. (Official Comment to U.C.C. § 9–306).

In summation PCA has no claim against the collateral, which Norris Sears and Sons Grain purchased, nor against the defendants who received payments for rent from the checking account of Charles Klipfer.

## IV. PURCHASE OF GRAIN BY FARMERSVILLE FEED AND GRAIN.

Duane Denlinger, Vice-President and General Manager of Farmersville Feed and Grain testified that Mr. Klipfer brought crops to "Farmersville" and informed "Farmersville" to place half of the crops in the name of Roger Wright and half in Mr. Klipfer's name. Mr. Klipfer also instructed "Farmersville" to sell the portion of the crops designated as Roger Wright's and to issue a check for the proceeds to Mr. Wright. On October 30, 1982 "Farmersville" issued a check to Roger Wright in the amount of $889.12. Mr. Denlinger also testified that he had no understanding of the relationship between Mr. Wright and Mr. Klipfer, although his testimony indicated that he understood that Mr. Klipfer was a farmer and Mr. Wright a landowner. "Farmersville" checked no public records to determine whether there was a security interest in the crops.

■ We find that Farmersville Feed and Grain purchased the crops subject to the security interest of PCA. The testimony of Mr. Denlinger reveals that "Farmersville" made no inquiry of Mr. Klipfer as to the ownership of the crops, checked no public records and simply followed the debtor's instructions. As such "Farmersville" accepted any risk that the crops in Mr. Klipfer's possession might be encumbered by a lien.[2]

As to the remaining half of the crops, which were placed in the name of Mr. Klipfer, "Farmersville" has no liability; that portion of the crops was subsequently returned to the debtor, who used it to feed his livestock.

We find that PCA is entitled to recover the value of the converted crops from Farmersville Feed and Grain in the amount of $889.12.

■ PCA is not entitled to a recovery against Roger Wright; there has been no evidence submitted for the purposes of tracing to indicate the location of any proceeds. Nor has there been sufficient evidence introduced to establish conversion on the part of Mr. Wright.

## V. CONDUCT OF THE DEBTORS

As part of their loan agreement with PCA, the debtors agreed to the following condition:

> 3. That we will report to Miami Valley PCA any intentions of grain or livestock sales and agree to a "FULL PROCEEDS" arrangement with respect to repayment on the PCA loan. We understand and agree that all of our grain sales will be paid first to the Miami Valley PCA and be sold by us in the form of Joint Checks, made payable to ourselves and the Miami Valley PCA, New Lebanon, Ohio.

■ Clearly the debtors did not comply with this contractual provision. Plaintiff PCA requests that the debtors' proposed Chapter 13 plan be modified in con-

2. Under legislation subsequently enacted by Ohio in 1983, the result, above, might be different. Currently under OHIO REV.CODE § 1309.26 a buyer of farm products from a person engaged in farming interests takes free of a security interest created by his seller unless the buyer receives a statutorily prescribed written notice from the lender and the buyer fails to comply with the instructions of the notice. *See, O'Diam, H. 291: Ohio's Attempt to Remedy Security Interests in Farm Products Under the UCC,* 9 U.Dayton L.Rev. 607 (1984).

formity with the allegations of its complaint and that the debtors be required to pay over the proceeds from the sale of the crops. In its post-trial memorandum of law, PCA has not elaborated on the specific form of relief that it seeks. Nevertheless, "courts must look closely at the debtor's conduct before confirming a plan." *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427, 432 (6th Cir.1982). Where a debtor's conduct has been dishonest it is permissible for a bankruptcy court to simply refuse confirmation of a plan. In instances where the conduct has not been shown to be dishonest, but is instead "questionable," the court may require full payment of a creditor's claim. *See id.* "In numerous decisions, this Court has concluded that the issue of good faith in the filing of a Chapter 13 Plan is a question of fact, with the burden of proof assigned to the objector to the proposed Plan." *Matter of Rose*, 40 B.R. 178, 179 (Bankr.S.D.Ohio 1984).

During the examination of Mr. Klipfer by PCA's counsel, the following exchange occurred:

Q: And you remember pledging that crop to PCA for payment of that $35,-000?

A: Yes, but there was a condition with that which I was trying to tell you about Mr. Koeller.

Q: Okay.

A: And I told him, I says I would be in agreement with this, but my landlords got paid first. And he seemed to agree with me verbally. Now there was nothing on paper. But that was one stipulation that I had to pay my land rent first.

Q: Mr. Klipfer, this conversation is not included in the written document you entered into with PCA, is it?

A: No.

(Tr. 17–18)

Although Mr. Klipfer's "understanding" of his loan agreement does not alter the terms of the written documents, it is relevant regarding an inquiry into whether he acted in "good faith" in selling his crops. The court is of the opinion that plaintiff has failed to prove that Mr. Klipfer was "dishonest" or acting in "bad faith" when he sold his crops. [Clearly, there is insufficient evidence to find that Mr. Klipfer's debt would be nondischargeable in a Chapter 7 proceeding.]

The issue of "questionable" conduct, however, is a close one and not easily determinable. Mr. Klipfer sold the great majority of his crops to an elevator not listed in his loan agreement as an authorized selling point. In addition he requested Norris Sears and Sons Grain to issue a check directly payable to him and did not inform the elevator of any lien by PCA on the crops. It was solely by the efforts of Norris Sears and Sons Grain that PCA was informed of the pending sale of the crops. The court can only regard Mr. Klipfer's conduct as "questionable." The conduct of PCA, however, is equally perplexing. Documents were drafted to ensure that joint checks would be made payable to Mr. Klipfer and PCA. Yet upon being notified that Mr. Klipfer was attempting to sell his crops to an unlisted elevator and that he was requesting checks made payable only to himself, PCA waived its own safeguards and permitted the transaction. It is the opinion of this court that the conduct of both the Plaintiff and the debtors has been questionable. It also appears from the debtors' schedules that they have committed a reasonable amount of their available income to funding the Chapter 13 plan. Therefore, as a matter of equity plaintiff is entitled to be paid in the same manner as other unsecured creditors, except for the following part of its claim. With regard to the grain placed in storage with Farmersville Feed and Grain (in Mr. Klipfer's own name) and subsequently fed to the debtors' livestock, only the debtors' conduct is questionable. There was no understanding that the grain was to be used for this purpose. We assume that the value of this grain was the same as the half sold on behalf of Roger Wright, and therefore $889.12 of PCA's claim will be repaid in full by the debtors.

For the foregoing reasons it is hereby ORDERED, ADJUDGED AND DECREED that Plaintiff be granted judgment against Farmersville Feed and Grain in the amount of $889.12; that Plaintiff be permitted to be paid by the debtors in full in the amount of $889.12 and that the remainder of its claim be paid as an unsecured claim in the debtors' Chapter 13 Plan; and that Plaintiff is denied recovery on its remaining claims.