**In re Edmund L. and Judith B. SMITH, Debtors.**

**Bankruptcy No. 3–84–00409.**

United States Bankruptcy Court, S.D. Ohio, W.D.

April 8, 1987.

* Now known as Doss, Puchalski, Keenan & Bargiel, Ltd.

Reginald W. Jackson, Columbus, Ohio, for debtors.

Ray A. Cox, Dayton, Ohio, for PCA.

Barry P. Reich, Springfield, Ohio, for Prudential.

David F. Allen, Marysville, Ohio, for Ohio Grain.

## DECISION AND ORDER

WILLIAM A. CLARK, Bankruptcy Judge.

Dated at Dayton, Ohio in said District on this 8th day of April, 1987.

This matter is before the court upon the motions of debtors Edmund L. Smith and Judith B. Smith to 1) determine the validity of certain interests in debtors' 1986 crops, and 2) to obtain a *nunc pro tunc* order authorizing the debtors to obtain secured credit and grant a security interest to The Ohio Grain Company.

## FACTS

Prior to the hearing, the following agreed stipulations were entered into by the debtors, Miami Valley Production Credit Association ("PCA"), and the Prudential Insurance Company of America ("Prudential"):

"1. That by Mortgage Deed dated June 30, 1978, Debtors conveyed to the Prudential Insurance Company of America ('Prudential') a valid lien upon all of Debtor's right, title and interest on and to the real property described therein.

"2. The Prudential Mortgage was given to secure a certain Promissory Note of even date therewith, in the original amount of $650,000.00.

"3. That the real property which is subject to the mortgage lien of Prudential was sold by the Sheriff of Champaign County, Ohio at Sheriff's Sale conducted on January 16, 1987 in Case Number 86–CIV–56. The confirmation of said sale is still pending.

"4. The net proceeds to Prudential from the sale of the real estate will not be sufficient to satisfy Debtors' obligations under the Promissory Note.

"5. Prudential's Mortgage contains the following language:

As further security for payment of the indebtedness and performance of the obligations, covenants and agreements secured hereby, Grantor hereby transfers, sets over and assigns to Grantee:

b. All other rents, issues and profits of the premises from time to time accruing, whether under leases or tenancies now existing or hereafter created, reserving to Grantor, however, so long as Grantor is not in default hereunder, the right to reserve and retain such rents, issues and profits.

"6. The Prudential Mortgage was filed for record in the Office of the Recorder, Champaign County, Ohio on June 30, 1978 at 1:30 p.m. and was recorded in Volume 233, pages 436–442.

"7. Prudential has filed no financing statements evidencing its lien interests in any crops ever grown by Debtors, including the 1986 crop.

"8. Prior to the claims raised in the aforesaid state court proceeding, Prudential never sought to enforce its purported lien interest in crops grown by Debtors.

"9. Since the filing of their Chapter 11 petition, debtors have executed no document or agreement with Prudential which granted Prudential an interest in crops grown post-petition.

"10. No order entered in this bankruptcy proceeding has granted Prudential an interest in Debtors' post-petition crops.

"11. Miami Valley Production Credit Association ('PCA') holds a second mortgage on the real property subject to Prudential's mortgage as well as a first mortgage on two tracts of property owned by Debtors. In addition, PCA claims to hold a first mortgage on real property owned by Jesse and Wilma Smith.

"12. PCA's mortgage upon Debtors' real property was filed on September 29, 1981 in the Office of the Recorder, Champaign County, Ohio, and recorded in Volume 247, pages 1048–1054.

"13. PCA's mortgage contains a provision pursuant to which Debtors' grant and convey to PCA the 'rents, issues and profits ... and crops, thereon' or hereafter erected thereon associated with the real property subject to its mortgage.

"14. PCA has filed the following financing statements with respect to interests in Debtors' crops.

    a. Financing statement number 13626 on January 24, 1972, Champaign County Recorder covering 'all crops of soybeans and corn' and 'all harvested crops of small grains.' Said financing statement was continued by continuation statements filed on December 16, 1976, December 16, 1981, and December 11, 1986.

    b. Financing statement number 31533 filed June 2, 1982, Champaign County Recorder, covering 'All crops of corn and soybeans' and 'harvested and/or stored grain'.

    c. Financing statement number 33552 filed September 2, 1983, Champaign County Recorder, covering 'All 1983 crops of corn, wheat and soybeans. All 1983 crops of cornnuts' and 'All harvested and stored crops of grain and feed. All stored cornnuts.'

    d. Financing statement number 9126 filed September 6, 1983, Clark County Recorder, covering 'All 1983 crops of corn, wheat and soybeans. All 1983 crops of cornnuts' and 'All harvested and stored crops of grain and feed. All stored cornnuts.'

    e. Financing statement number 15471 filed June 19, 1985, Clark County Recorder, covering 'All crops growing or to be grown in 1985' and 'All harvested crops and grain in storage and general intangibles arising from the sale thereof, for 1984 and 1985.'

    f. Financing statement number 36306 filed June 19, 1985, Champaign County Recorder, covering 'All crops growing or to be grown in 1985' and 'All harvested crops and grain in storage and general intangibles arising from the sale thereof, for 1984 and 1985.'

"15. That PCA was granted a lien upon Debtors' 1984 post-petition crop in conjunction with an Order granting Debtors' use of PCA's cash collateral.

"16. That PCA was granted a lien upon Debtors' 1985 post-petition crop to secure the obligations of Debtors to PCA as outlined in that certain Agreed Judgment Entry and Order entered in Contested Matter B on July 10, 1985.

"17. Neither PCA nor Prudential extended Debtors financing to produce, cultivate or harvest the 1986 crop.

"18. That on April 18, 1986 Debtors signed a Note in favor of The Ohio Grain Company ('Ohio') in the amount of $100,000 or such lesser sum as might be outstanding after the aforesaid date.

"19. To secure the repayment of the Ohio Note, Debtor, Edmund L. Smith, executed and delivered to Ohio his certain security agreement pursuant to which it was intended that Ohio be granted a lien on Debtors' 1986 crop of corn and soybeans and the proceeds thereof.

"20. Ohio filed financing statement number 37762 on May 9, 1986, with the Champaign County Recorder."

\*    \*    \*    \*    \*    \*

Debtors filed their petition in bankruptcy on February 27, 1984.

At the hearing, Mr. Roland K. Schreider-er, Vice-President and Chief Financial Officer of The Ohio Grain Company testified that in March of 1986 he agreed on behalf of Ohio Grain to provide financing for Mr. Smith's 1986 crops. Some funds were advanced by Ohio Grain prior to the parties

entering into a formal loan arrangement. On April 18, 1986 Mr. Smith signed a note in favor of Ohio Grain in the amount of $100,000 and executed a security agreement and financing statement purporting to grant to Ohio Grain a security interest in the 1986 crops. Mr. Smith did not receive $100,000 upon the signing of the note. Instead, he was provided with the funds as he incurred expenses in his farming operations. Mr. Schreiderer characterized the loan arrangement as similar to a "line of credit." As of December 31, 1986, the balance on the note was $93,490.41.

Mr. Schreiderer testified that he was aware that Mr. Smith was a chapter 11 debtor in bankruptcy, but he did not request that the debtor obtain the bankruptcy court's approval of the loan by Ohio Grain. It was his belief that the loan was part of the debtors' normal course of business. Additionally, he stated that Ohio Grain had a similar arrangement with the debtors in 1985 and had been paid.

Finally, Mr. Schreiderer testified that the loan would not have been made without a crop lien being granted by the debtors.

Mr. Edmund L. Smith testified as follows:

—Mr. Schreiderer's testimony accurately reflected the financing arrangement with Ohio Grain;

—All supplies obtained with Ohio Grain's funds were used in the production of the 1986 crop;

—He would not have been able to have produced a 1986 crop without Ohio Grain's financing;

—All of his 1986 crop is in storage;

—The crops consist of approximately 65,000 bushels of corn and 18,000 bushels of soybeans;

—The corn was planted in late April of 1986 and the soybeans in early May;

—Mr. Smith intended to grant a security interest to Ohio Grain in the crops on all of his parcels of land;

—Mr. Smith contracted to grow cornnuts for the Corn Nuts Corporation and seed corn for Landmark. Proceeds from these contracts (approximately $100,000) were used for the harvesting expenses of the 1986 corn and soybean crops;

—The sale of the 1986 crops will probably result in a loss.

CONCLUSIONS OF LAW

I. CLAIM OF PCA

PCA maintains that security agreements and financing statements, executed prior to the filing of debtors' petition in bankruptcy, entitle it to a secured interest in the debtors' 1986 crops. PCA's position is not supported by the Bankruptcy Code. Specifically, 11 U.S.C. § 552, which governs the postpetition effect of a security interest, reads as follows:

§ 552. Postpetition effect of security interest.

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

(b) Except as provided in section 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

"As a general rule, if a security agreement is entered into before the case, then property that the estate acquires is not subject to the security interest created by the security agreement. Subsection (b)

provides the only exception." H.R.Rep. No. 595, 95th Cong., 1st Sess. 376 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6332. The prepetition security agreements of PCA clearly fall within the scope of the general rule of Section 552(a). The debtors' crops were planted subsequent to the chapter 11 filing and are, therefore, after-acquired property within the meaning of Section 552. *Huisinga v. Security Bank and Trust Co. (In re Drewes)*, 68 B.R. 153 (Bankr.N.D.Iowa 1986).

▮ Further, the 1986 crops were not proceeds or offspring of any crops subject to a PCA lien. "11 U.S.C. § 552(b) clearly does not make an exception for 'crops' arising post-petition." *In re Sheehan*, 38 B.R. 859, 863 (Bankr.S.D.1984). *See also First National Bank of Colorado Springs v. Hamilton (In re Hamilton)*, 18 B.R. 868 (Bankr.Colo.1982); *Matter of Gross-Feibel Co.*, 21 B.R. 648 (Bankr.S.D.Ohio 1982).

PCA has repeatedly emphasized that its security agreements cover not only growing crops, but also all harvested and stored crops, and that this feature of its security agreements enables it to avoid the operation of 11 U.S.C. § 552. In support of its position, PCA relies on this court's decision of *Miami Valley Production Credit Assoc. v. Klipfer (In re Klipfer)*, 62 B.R. 290 (1986). The court does not follow PCA's reasoning on this point and finds no support for PCA in the *Klipfer* case. *Klipfer* dealt with the requirement that security agreements and financing statements, which relate to crops, contain a description of the pertinent real estate. One of *Klipfer's* holdings was that an unperfected security interest (because of an inadequate real estate description) in growing crops could subsequently become perfected and enforceable by reason of the harvesting of crops. However, all of the relevant transactions in *Klipfer* occurred prior to the filing of the debtor's bankruptcy petition. Section 552 of the Bankruptcy Code was not material to the outcome of *Klipfer*. *Klipfer* is simply not relevant to the instant matter.

The court finds by virtue of 11 U.S.C. § 552 that PCA has no interest in the debtors' 1986 crops.[1]

## II. *PRUDENTIAL'S MORTGAGE*

Prudential's real estate mortgage may be examined from two viewpoints: 1) as a direct security interest in the debtors' crops under Article 9 of the U.C.C., or 2) as a security interest in the debtors' real estate together with the rents and profits of that real estate under non-U.C.C. state law.

### A. PRUDENTIAL'S MORTGAGE UNDER THE U.C.C.

▮ When the debtors filed their petition in bankruptcy, did Prudential have any interest in debtors' future crops under the provisions of Ohio's U.C.C. law? Although the U.C.C. does not govern real estate mortgages, there is nothing contained in Article 9 of the U.C.C. preventing a real estate mortgage from also serving as a security agreement covering crops. Naturally, all of the formal statutory requisites for creating the security agreement and perfecting it must still be fulfilled. OHIO REV.CODE § 1309.14 [U.C.C. 9–203] reads, in pertinent part, as follows:

(A) Subject to the provisions of section 1304.14 of the Revised Code on the security interest of a collecting bank, section 1308.36 of the Revised Code on security interests in securities, and section 1309.-11 of the Revised Code on a security interest arising under sections 1302.01 to 1302.98 of the Revised Code, a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:

(1) The collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral and in addition, when the security interest covers crops growing or to be grown or timber to be cut, a description of the land concerned; and

(2) Value has been given; and

---

1. The postpetition crop liens granted by the debtors to PCA are not pertinent to the instant matter. The terms and conditions of those agreements were fulfilled.

(3) The debtor has rights in the collateral.

(B) A security interest attaches when it becomes enforceable against the debtor with respect to the collateral. Attachment occurs as soon as all of the events specified in division (A) of this section have taken place unless explicit agreement postpones the time of attaching.

When the debtors filed their petition in bankruptcy, the debtors obviously had no rights in the 1986 crops for the simple reason that such crops were nonexistent. A security interest does not attach in crops until they are planted. *In re Kruse*, 35 B.R. 958 (Bankr.Kan.1983). Therefore, at the time the debtors filed their petition in bankruptcy, any purported security interest of Prudential in debtors' future crops had not attached.

■ More importantly, no financing statement was filed by Prudential as required by OHIO REV.CODE § 1309.21 [U.C.C. 9–302]. Therefore, even assuming an attachment of Prudential's security agreement, the interest was never perfected under the U.C.C., and is inferior to the rights of the debtors-in-possession under 11 U.S.C. § 544.

## B. DOES PRUDENTIAL HAVE RIGHTS IN DEBTORS' 1986 CROPS BY VIRTUE OF OHIO'S REAL ESTATE LAW?

■ Although Prudential obtained no rights to the debtors' 1986 crops under the provisions of Article 9, the question remains whether Prudential acquired any interest in the crops under Ohio's real estate law. Prudential asserts that the "rents and profits" provision in the mortgage, accompanied by the appointment of a receiver in state court, is sufficient to grant it a lien upon the debtors' crops.

There are cogent arguments that Article 9 provides the exclusive method of obtaining a consensual security interest in crops. However, this court has found no Ohio case addressing the subject and it is unnecessary to reach that issue in the instant proceeding. Prudential relies on the decision of *Fourman v. Anderson*, 21 O.L.A. 222

(Ohio Ct.App.1935) for its position that its initiation of foreclosure proceedings (following the lifting of the automatic stay of 11 U.S.C. § 362), accompanied by the appointment of a state receiver, granted it a lien in debtors' 1986 crops. In *Fourman* the court concluded that a reference to "rents and profits" contained in a mortgage was a valid contract as to future crops, whereby the land owner agreed to give a lien to the mortgagee as crops were planted. The court also observed that:

> [I]n order to perfect its lien upon the wheat which was sowed before judgment and sale, the Union Central Life Insurance Company should have exercised some right of possession or ownership over the crop. Ordinarily, in foreclosure actions, this sort of lien is perfected by seeking the appointment of a receiver. *Id.* at 224.

*Fourman* was written long before Ohio's adoption of the U.C.C. and its continuing viability is open to question. But assuming that *Fourman* represents a correct statement of Ohio law, it does not assist Prudential. Here, the debtors' 1986 crops were acquired postpetition and formed part of the debtors' bankruptcy estate pursuant to 11 U.S.C. § 541(a)(6) and (7). As such, the crops are subject to the automatic stay provisions of 11 U.S.C. § 362, which stays "any act to create, perfect, or enforce any lien against property of the estate." 11 U.S.C. § 362(a)(4). Prior to exercising "some right of possession or ownership over the crop," as required by *Fourman*, it was necessary for Prudential to obtain permission from the Bankruptcy Court.

On March 27, 1986 this court entered an order (Doc. No. 119), which continued debtors' confirmation hearing and granted to the debtors a short period of time to obtain funding for their plan. It was also ordered that:

> [S]hould Debtors not comply with the terms of this Order, then Prudential Life Insurance Company upon the filing of an affidavit alleging such default and service of same upon Debtors and counsel to Debtors, shall be entitled to automatic

relief from the § 362 automatic stay without further order of this Court.

On April 25, 1986 Prudential filed an affidavit of default (Doc. No. 121).

Although this court's order of March 27, 1986 certainly permitted Prudential to foreclose on the debtors' real estate, there is nothing in the order or the affidavit of default to suggest that foreclosure upon the estate's crops was either anticipated or justified. Perhaps Prudential has confused the provisions for relief from stay with those of abandonment. At all times the crops have remained property of the debtors' estate.

Prudential's request for a receiver in state court for the purpose of perfecting a lien on the crops was clearly contrary to the protective provisions of 11 U.S.C. § 362. It is a well-established rule that actions taken in violation of Section 362 are null and void. Therefore, even under *Fourman*, Prudential has not perfected a security interest in the debtors' 1986 crops.

### III.  CLAIM OF OHIO GRAIN

Section 364 of the Bankruptcy Code governs the obtaining of credit by a trustee or a debtor-in-possession. Although a debtor-in-possession may incur unsecured debt in the ordinary course of business, without court approval, the legislative history of the Bankruptcy Code indicates that obtaining a substantial loan in an operating case is other than in the ordinary course of business. H.R.Rep. No. 595, 95th Cong., 1st Sess. 346–47 (1977), U.S.Code Cong. & Admin.News 1978, pp. 6302, 6303.

Here, the debtors were unable to obtain unsecured credit and attempted to grant a lien to Ohio Grain upon estate property pursuant to 11 U.S.C. § 364(c). Despite Ohio Grain's knowledge that the debtors were chapter 11 debtors, no court approval was sought for the loan. By failing to seek court approval, there was, of course, no notice and hearing as required by Section 364(c), with the result that other creditors were deprived of an opportunity to impose objections to the proposed transaction. At least one court has regarded failure to seek court approval for a loan as

such a serious danger to the integrity of administration of bankruptcy estates, that the creditor was denied even the status of a general unsecured creditor. *Matter of Alafia Land Development Corp.*, 40 B.R. 1 (Bankr.M.D.Fla.1984). Another judicial approach has been to find that any lien granted by the debtor to the lending creditor is void or voidable because the debtor has no power under the Bankruptcy Code to grant such a lien. *Serbus v. First National Bank of Elbow Lake*, 53 B.R. 187 (Bankr.Minn.1985). Under the circumstances of this case, this court agrees with the court in *Serbus*.

It is also apparent from previous filings with the court, that these debtors are familiar with the proper procedure for obtaining operating loans.

Despite the serious nature of the lack of prior court approval for the loan, certain facts of this case persuade the court that Ohio Grain should be granted equitable consideration of its claim. This is not a case where the debtor has attempted to grant a lien to a creditor in previously unencumbered property at the expense of the general creditors. The fundamental fact is that Ohio Grain's loan did not just preserve the bankruptcy estate, but in fact "created" a portion of that estate. To allow Ohio Grain no recovery from the 1986 crops would result in the creation of a "windfall" for the other creditors. Nevertheless, this rationale has its limits. From Mr. Smith's testimony, it appears that it was not just Ohio Grain's loan proceeds that were used to produce the 1986 crops. Other funds (such as the proceeds from the sale of cornnuts and seed corn) were also used for harvesting expenses. To the extent that the cost of producing the 1986 crops exceeds the selling price, the loss may fall upon the general creditors. Such a result is no more justifiable than permitting the general creditors to share in the funds generated by the sale of the crops before payment of the expenses of producing the crop. Therefore, this court will impose an equitable lien upon the "net proceeds" of the 1986 crops in favor of Ohio Grain. Further affidavits must be sub-

mitted by the debtors-in-possession regarding the cost of producing the 1986 crops and the sources of funds used. At this juncture the evidence is insufficient to enable the court to calculate the cost of production. Obviously, "net proceeds" can not be determined until the crops are sold.

For the foregoing reasons it is ORDERED that PCA and Prudential have no rights in the debtors' 1986 crops and that Ohio Grain has an equitable lien in the "net proceeds" of the debtors' crops.

It is further ORDERED that debtors submit appropriate supplementary material to enable the court to determine the amount of "net proceeds" from the 1986 crops.