In the Matter of ALAFIA LAND DE-
VELOPMENT CORP., Debtor.

Bankruptcy No. 82–406.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Feb. 22, 1984.

Jack Zinkow, Orlando, Fla., for creditor.

Charles Lane, Tampa, Fla., for Tropic
Bank.

Charles Ketchey, Jr., Malka Isaak, Tam-
pa, Fla., for Tampa Bay Trucking.

Albert I. Gordon, Tampa, Fla., for debt-
or.

## MEMORANDUM OPINION

ALEXANDER L. PASKAY, Bankruptcy
Judge.

THIS IS the next, and hopefully the last,
chapter in the turbulent history of the tri-
als and tribulations of Alafia Land Devel-
opment Corporation (Alafia), the Debtor,
who initially sought relief under Chapter
11 of the Bankruptcy Code, stumbled its
way to rehabilitation, fell into a Chapter 7
liquidation case, but ultimately arrived af-
ter a long journey to a successful resolu-
tion of its financial problems.

To put the immediate matters under con-
sideration into context, it should be helpful
to briefly recap the background of the rele-
vant facts as they appear from the undis-
puted record.

At the time pertinent to the matters un-
der consideration, Alafia was the owner of
a large tract of land located in the east part
of Hillsborough County, Florida. The
property was operated primarily as a bor-
row pit. This operation basically involved
the excavation of dirt from the subject land
and the sale of same to contractors to be
used as landfill either in connection with
construction projects or in connection with

road building operations. The subject property was encumbered by a first mortgage in favor of A.M. Crowell, Jr. (Crowell) and Tropic Bank, the holder of the second mortgage.

Alafia is a closely held corporation and all outstanding stock in the corporation is owned by Mr. Cullen Williams, generally referred to in these proceedings as Buster, and his wife, Betty Williams. Both Mr. and Mrs. Williams are themselves involved in a Chapter 11 proceeding as individual debtors.

The Petition for Relief under Chapter 11 was filed by Alafia on March 5, 1982. On March 8, 1982, three days after the Debtor filed its Petition, the Court entered an Order Authorizing the Debtor in Possession to Continue Business. The Order provides in pertinent part:

1. The debtor shall continue in possession of its property and shall have all the title and may exercise, consistently with the provisions of Chapter 11 of the Bankruptcy Code; subject, however, at all times to the control of the Court and to such limitations, restrictions, terms and conditions as the Court may from time to time prescribe.

2. The debtor in possession be and hereby is authorized subject to the control of this Court, to operate its business and manage its property until further order of this Court; to employ, discharge and fix the salaries and compensations of all managers, agents and employees, except salaries and compensations of the debtor, attorneys for the debtor, and the officers, directors, and stockholders, which compensation will be determined by this Court. It is further ordered, however, that the debtor in possession be and hereby is authorized and directed to pay the employees' wages earned by them within the pay period immediately preceding the filing of the petition for the arrangement.

3. The debtor in possession may use, sell or lease properties of the estate, but only in conformity with Sec. 363(b), (c)(1), (2), (A), (B), and (4) of the Bankruptcy Code. The debtor in possession may, subject to this Court's approval, assume or reject any executory contract or unexpired lease as authorized by Sec. 365 of the Bankruptcy Code.

4. The debtor in possession be and hereby is authorized and directed, until further order of this Court, to pay all necessary and current expenses of operation of the business or imposed upon the debtor's property insofar as such payments are necessary in connection with the preservation of the assets and the operation of the business, provided, however, that such payments shall be limited to the satisfaction of the obligations incurred by the debtor since the filing of the petition, with the exceptions hereinafter stated.

At the time the petition was filed, Alafia was already in serious default on its mortgage obligations. Thus, it was not surprising that Crowell, the holder of the first mortgage, immediately moved for relief from the automatic stay imposed by § 362 of the Bankruptcy Code in order to proceed to foreclose his mortgage lien interest on the subject property. For a time Alafia successfully resisted relief from this Court, but ultimately this Court granted relief to the Crowell interest, removed the automatic stay and permitted Crowell to proceed to enforce his mortgage lien interest against the subject property. In light of this development, Alafia's prospects of accomplishing a successful arrangement reached a low point. In fact, Alafia appeared to be at the brink of disaster and either a conversion to a Chapter 7 liquidation or a dismissal appeared to be inevitable. As a matter of fact, this is exactly what happened. On March 28, 1983, the Debtor filed a consent to conversion. On April 4, 1983, the Court entered an order converting the case and appointed George T. Hadley as the Chapter 7 Trustee.

Crowell, having obtained relief from the automatic stay, proceeded immediately to resume the foreclosure action in the state court. Of course, at this point, the prospects of Alafia's survival appeared to be

hopeless. Lo and behold, Alafia suddenly regained strength and like a Phoenix, arose from the ashes of its financial demise. On June 17, 1983, the stockholders of the Debtor filed an Application to Convert the case back to Chapter 11, and on July 7, 1983, the Court entered an Order and granted the relief sought. Shortly thereafter, the Debtor filed an Amended Plan of Reorganization which proposed to pay all creditors, secured and unsecured, 100% of their allowed claims. This fortuitous turn of events would have ordinarily put this case to rest, except for the appearance of an administrative claimant who now asserts that it is entitled to payment in full. The claimant originally asserted a claim in excess of a quarter of a million dollars, but later, amended to a claim of first priority close to a half of a million dollars. This is the matter under consideration and the relevant facts as they appear from the record are as follows:

On July 16, 1983, Tampa Bay Trucking, Inc. (TBT) filed an Application for Allowance of Administrative Expense which is the claim presently under challenge by the Debtor. The initial claim, as noted, was filed in the amount of $269,000 and was based on the following allegations:

1. On or about November, 1982, Tampa Bay Trucking (Tampa Bay) entered into an agreement with Debtor pursuant to which Tampa Bay operated Debtor's business.

2. Pursuant to the above-described agreement, Tampa Bay operated Debtor's business from November, 1982, to date.

3. As a result of the operation of Debtor's business, there is currently due and owing by Debtor to Tampa Bay the amount listed on Exhibit "A", which is attached hereto and made a part hereof.

By a subsequent amendment to the Application for Allowance of Administrative Expense, TBT sought to increase its claim to $456,697.05.

The Debtor filed an Objection to TBT's Application contending that (1) the Debtor in Possession had no authority to enter into

any agreement whereby TBT would operate the Debtor's business inasmuch as the Court did not authorize or approve the same, and (2) TBT never rendered an accounting of its operation to the Court.

At the initial hearing on the Debtor's objection, the parties stipulated that the maximum amount claimed is reduced to $350,000. TBT also stated that the first four payments of $25,000 each, allegedly paid to Crowell, should be eliminated from the claim and that the $75,000 payment to Tropic Bank, the holder of the second mortgage should be eliminated and replaced by a $50,000 payment to the Debtor.

The written agreement upon which TBT bases its Application for Administrative Expense was executed on November 15, 1982 by the Debtor through Cullen H. Williams, its president, TBT, and the "Jan D. Uiterwyk Group." The agreement provided that TBT would purchase the "borrow pit" from the Debtor for the payment of the two mortgages, the payment of the federal tax lien encumbering the property and payment to unsecured creditors "upon such terms and conditions as shall be most advantageous to Tampa Bay Trucking, Inc. and the Debtor." The agreement also provided that:

4. It is understood and agreed by the parties hereto that ALAFIA and BUSTER are presently in a Chapter 11 proceeding. All parties agree to seek certain approval from the Bankruptcy Court, upon terms and conditions satisfactory to TBT, in order to effectuate this Agreement and to terminate the Chapter 11 proceedings of ALAFIA.

There is no question that neither the Debtor nor TBT sought court approval of the November 15 agreement, and it appears that the agreement was ultimately abandoned by the parties. In spite of lack of court approval, TBT on or about November 15, 1983 assumed control over the affairs and assets of Alafia including the borrow pit and the Debtor's equipment, and commenced to operate the business of digging and selling fill dirt. TBT continued to operate the Debtor's business until approxi-

**4**

mately June 16, 1983, at least two months after the case had been converted to a Chapter 7 case, even though the administration of the estate was, at this turn of events, in the hands of the Trustee after conversion.

No one disputes the fact that the Court never sanctioned the arrangement between the Debtor and TBT or the operation conducted by TBT. However, at the initial hearing counsel for TBT by ore tenus motion on this matter requested that the court enter an order, nunc pro tunc, approving the actions of TBT.

█ Nunc pro tunc approval of transactions not initially authorized is well within the equitable power of a court of bankruptcy and it is, of course, discretionary. *Central States Corp. v. Luther*, 215 F.2d 38 (10th Cir.1954); *In re Avorn Dress Company, Inc.*, 79 F.2d 337 (2d Cir.1935). Thus, an unauthorized loan may even receive priority as an expense of administration in unusual circumstances. *In re Avorn Dress Company, Inc., supra.*

However, the Second Circuit expanded the *Avorn* doctrine in *In re American Cooler Company, Inc.*, 125 F.2d 496 (2d Cir.1942), spelling out the equitable test for determination of nunc pro tunc approval of an unauthorized loan:

We think that the judge should not retroactively validate the loan unless he is confident that he would have authorized it if timely application had been made, and unless, in addition, he is reasonably persuaded that the creditors have not been harmed by continuation of the business made possible by the loan. He should also take into account, as bearing on the good faith of the debtor and lender, whether or not they honestly believed that they had authority to enter into the transaction. Of necessity, each case must stand on its own facts and these criteria cannot be mechanically applied; they should, however, materially facilitate the preparation of an intelligent record. We should emphasize that this equitable power must be cautiously exercised, and that only a foolhardy lender

will attempt to make it serve as a substitute for proper authorization.

*In re American Cooler Company, Inc., supra* at 497.

TBT contends that an application of the *American Cooler* test to the facts of this case warrants the entry of an order, nunc pro tunc, approving the TBT—Alafia arrangement and the allowance of its claim.

Based on this record, this Court is satisfied that nunc pro tunc approval would not be appropriate in this case for two major reasons. First, the agreement did not represent a meeting of the minds to begin with and, in fact, there never was an agreement. Second, the Court would not have approved this agreement as it was structured by the parties had the Debtor initially sought an approval. The agreement failed to specify who would bear losses and/or reap the profits from the operation prior to closing. Further, the agreement did not include any safeguards to insure that the interests of the estate would be protected. The fact of the matter is that TBT "jumped the gun" and took over the business of the Debtor lock, stock and barrel unfettered and devoid of any control and accounting to anyone. It is without dispute that TBT operated the Debtor's business for approximately 8 months and there is no evidence that the estate was compensated for dirt removed or the use of the Debtor's equipment. More importantly, this Court is satisfied that the record fails to support the proposition that TBT held a good faith belief that the Debtor had authority to enter into the transaction. TBT is a Florida corporation incorporated on November 5, 1982 by the office of George F. Allen, a Tampa attorney. Mr. Allen was a principal of TBT and a member of the Jan D. Uiterwyk Group. Mr. Allen contends that he was not aware that the Court had not approved either a sale of the Debtor's assets or the arrangement whereby TBT agreed to operate and did so operate the Debtor's business. Even if this Court accepts the statement at face value, which is difficult if not impossible to do under the facts of this case, it is clear that Jan D. Uiterwyk, as well as the Debtor

were fully aware and had knowledge of the lack of court approval.

It should be noted that at the time that TBT was operating the Debtor's business, George Allen also represented one Arlis Roberts and Cheval Development Corporation (Cheval), each of whom claim or have claimed ownership of the second mortgage encumbering the borrow pit, i.e. the Tropic Bank mortgage. It also appears that George Allen, TBT, Jan D. Uiterwyk and Larry McDonald were members of the Jan D. Uiterwyk Group and that Cheval as well as Almac-U-Corporation, which at some point advanced funds to the Debtor, are corporations owned by the Jan D. Uiterwyk Group. The record further reveals that Cheval purchased the second mortgage at an unusually big discount and stands to realize a substantial profit upon satisfaction of the mortgage. While these facts viewed in isolation might not be dispositive of the issue of good faith, upon examination of the entire record, this Court simply cannot find that the parties to this arrangement acted in good faith and justifiably believed that the Court had, in fact, sanctioned this arrangement. Thus, there is no doubt that the nunc pro tunc approval sought by TBT shall be denied under the guidelines set forth by *American Cooler, supra.*

Counsel for TBT next urges that even without nunc pro tunc prior approval of the claim of priority, TBT is entitled to be recognized as a creditor and at least awarded the status of a general unsecured creditor. In support of this proposition, TBT relies on 2 *Collier on Bankruptcy,* ¶ 364.-03 (15th ed. 1979) where it stated that "where the borrowing is out of the ordinary course of business and prior court authorization is not obtained, the lender may be relegated to the status of a general unsecured creditor."

■ It is the opinion of this Court, despite the language cited from the 15th Edition of *Collier on Bankruptcy*, this is an incorrect statement of the law and that one who lends money to a debtor in possession without prior approval of the Court is not even entitled to the status of a general unsecured claim. *See,* 8 *Collier on Bankruptcy,* ¶ 6.32[3] n. 20 (14th ed. 1974); *In re Industrial Machine & Supply Co.,* 112 F.Supp. 261 (W.D.Pa.1953). To hold otherwise is to jeopardize the integrity of administration of estates by debtors which is of paramount importance. To ratify unauthorized borrowings or out of the ordinary course of business transactions, except under the exceptional circumstances stated in *Avorn Dress, supra; American Cooler, supra* would create a dangerous precedent which may likely produce pernicious results, hostile and inimical to any legitimate and recognized goals and rehabilitative aims of the Bankruptcy Code.

However, this is an unusual case because the Debtor will pay in full all allowed claims under the confirmed plan of reorganization. Accordingly, this leaves for consideration the question of whether a claim or any part of the claim of TBT can be recognized on general equitable principles, in light of the fact that any surplus remaining will inure to the benefit of the Debtor.

Principles of equity were part and parcel of all bankruptcy jurisprudence ever since there was a bankruptcy statute on the books. As stated by the Court of Appeals for the Tenth Circuit in *Central States Corp. v. Luther,* 215 F.2d 38 (10th Cir. 1954):

"A bankruptcy court is a court of equity and is guided by equitable principles and doctrines except when they are inconsistent with the Bankruptcy Act, 11 U.S.C.A. § 1 et seq. *Continental Illinois National Bank & Trust Co. v. Chicago Rock Island & Pacific Railway Co.,* 294 U.S. 648, 676, 55 S.Ct. 595, [606] 79 L.Ed. 1110; *Securities and Exchange Commission v. United States Realty \* Improvement Co.,* 310 U.S. 434, 455, 60 S.Ct. 1044, [1053] 84 L.Ed. 1293. In passing upon the allowance of claims, a bankruptcy court sits as a court of equity clothed with the jurisdiction to sift the circumstances surrounding any claim to see that injustice and unfairness is not done in the administration of the bank-

ruptcy estate. *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281; *W.F. Sebel Co. v. Hessee,* 10 Cir., 214 F.2d 459. And acting within the framework of the Bankruptcy Act, a court of bankruptcy has power to subordinate the claim of other creditors where subordination is necessary to prevent the consummation of conduct which is inequitable; has power to attach appropriate conditions to the allowance of a claim; and has power to require a claimant to do equity before receiving equity in the proceeding. *Pepper v. Litton, supra; American Surety Co. of New York v. Sampsell,* 327 U.S. 269, 66 S.Ct., 571, 90 L.Ed. 663; *Heiser v. Woodruff,* 327 U.S. 726, 66 S.Ct. 853, 90 L.Ed. 970; *In re Erickson,* 7 Cir., 106 F.2d 937; *In re Commonwealth Light & Power Co.,* 7 Cir., 141 F.2d 734; *In re Kansas City Journal-Post Co.,* 8 Cir., 144 F.2d 791; *In re V. Loewer's Gambrinus Brewery Co.,* 2 Cir. 167 F.2d 318.

■ Based on these principles, this Court is satisfied that it is proper in this case to consider the respective equities involved and especially to consider the extent to which the funds expended by TBT reduced the mortgage debts owed on the first and second mortgage which in turn enhanced the Debtor's equity in the subject property.

This Court is not unmindful of the pretrial agreement by TBT that the first four payments of $25,000 paid to Crowell should be eliminated from the claim and that a $75,000 payment to Tropic Bank should be replaced by a $50,000 payment to the Debtor. It is evident that under the facts of this case it would be patently unfair to permit this Debtor to reap a windfall by retaining the surplus generated from its enhanced equity position in the subject property as a result of the infusion of funds advanced by TBT or others connected with TBT. Therefore, this Court is satisfied that the Debtor's objection to the Application for Allowance of Administrative Expense shall be sustained in part and the claim shall be disallowed as a priority

and as a general unsecured claim for the reasons stated. However, the claim shall be recognized and paid on equitable principles to the extent that the principal and interest obligations on the Crowell and Tropic Bank mortgages were reduced by funds advanced on behalf of the Debtor either directly or indirectly by TBT or any other entity under its direction.

A separate final judgment will be entered in accordance with the foregoing.