## In re LODGE AMERICA, INC., Debtor.

### Eric C. Rajala, Plaintiff,

### v.

### Rudy Langer, Defendant.

Bankruptcy No. 95–21465–7.
Adversary No. 96–6127.

United States Bankruptcy Court,
D. Kansas.

May 21, 1999.

Eric C. Rajala, Overland Park, KS, plaintiff/trustee pro se.

R. Pete Smith, McDowell, Rice, Smith & Garr, Kansas City, MO, for defendant Rudy Langer.

## MEMORANDUM OPINION [1]

JOHN T. FLANNAGAN, Bankruptcy Judge.

Without court authority, the debtor-in-possession borrowed to pay its utilities and repaid the loan with estate funds. Section 549(a)(2)(B) avoids a postpetition transfer of estate property not authorized by the court or "under title 11." [2] The lender argues that the loan was in the ordinary course of debtor's business under § 364(a); therefore, the transfer was authorized "under title 11." [3] Did § 364(a) authorize the transfer that repaid the loan?

---

1. The plaintiff/trustee Eric C. Rajala appears on his own behalf. The defendant Rudy Langer appears by his attorney, R. Pete Smith of McDowell, Rice, Smith & Garr, Kansas City, Missouri.

2. 11 U.S.C. § 549. **Postpetition transactions.**

(a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—

(1) that occurs after the commencement of the case; and
(2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
(B) that is not authorized under this title or by the court.

3. U.S.C. § 364. **Obtaining credit.**

(a) If the trustee is authorized to operate the business of the debtor under section 721,

The court answers in the negative and rules for the Chapter 7 trustee on his post-conversion complaint to avoid the loan repayment transfer. Section 364(a) only authorizes an ordinary-course-of-business loan in exchange for an allowed administrative expense claim, not in exchange for a cash payment to one creditor before ratable distribution to all creditors of equal priority. Furthermore, .the lender has failed to prove that the unauthorized loan was made in the ordinary course of the debtor's business.

## Background

The debtor, Lodge America, Inc., acting through its president, Dennis Tenney, negotiated the loan and repaid it during the pre-confirmation stage of its Chapter 11 case. When the court converted the case to Chapter 7, Eric Rajala, the trustee, brought this action to recover the loan repayment from the lender, Rudy Langer.

Counsel have filed a pretrial order (Doc. # 20) and a stipulation of facts (Doc. # 36) in place of evidence and have presented arguments on the stipulation.[4] A paraphrased version of those stipulated facts follows.[5]

Lodge America, Inc., operated a hotel in Kansas City, Kansas. It experienced financial reverses and, acting through its president, Dennis Tenney, filed a *pro se* petition under Chapter 11 on July 26, 1995. Charles Kellogg and Michael Huffman entered their appearances as attorneys for Lodge America, Inc., on August 11, 1995.

Dennis Tenney hoped to find a national franchiser for the hotel and to convince Kansas City, Kansas, to refinance the hotel with industrial revenue bonds. Unfortunately, the hotel failed to generate sufficient cash flow with which to pay its utility bill with the Board of Public Utilities ("BPU"). Predictably, the BPU informed Dennis Tenney in mid-October of 1995 that unless the postpetition utility bill was paid, it would shut off the hotel's water and power immediately.

This ultimatum heralded disaster for Lodge America's reorganization. The Future Farmers of America annual convention, historically one of Kansas City's largest conventions, was scheduled for late October. The hotel had booked practically all of its rooms to FFA members at high rates. If the BPU were to cut off the hotel's utilities, approximately 700 FFA students would be without lodging and Lodge America would be without enough revenue to pay its expenses.

Facing this emergency, Tenney negotiated to delay the shut off. On October 18, 1995, the BPU agreed to relent if Lodge America would pay $16,000 of the delinquent utility bill by 5:00 p.m. that very day. If not, the BPU would shut off the utilities at 8:00 A.M. the next day, October 19.

Tenney's negotiations coincided with a hearing on other issues in the case previously scheduled for October 18. Tenney

1108, 1203, 1204, or 1304 of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.

4. The parties have stipulated in the pretrial order that the court has jurisdiction over the parties and subject matter of the action; and that venue in this district is proper. The court finds independently of the stipulation that this proceeding is core under 28 U.S.C. § 157 and that the court has jurisdiction under 28 U.S.C. § 1334 and the general reference order of the District Court effective July 10, 1984 (D.Kan.Rule 83.8.5).

5. The following six exhibits are attached to the stipulation: (1) Langer's canceled check to the Kansas City, Kansas, Board of Public Utilities dated October 25, 1995, (2) the BPU's receipt of payment records allocating Langer's payment, (3) Lodge America's promissory note to Rudy Langer dated October 25, 1995, (4) a partial transcript of the hearing before this court on October 18, 1995, (5) Lodge America's check for $16,000 payable to Rudy Langer dated November 8, 1995, with Langer's endorsement, and (6) an affidavit of Dennis Tenney dated February 3, 1997.

appeared at the hearing with one of Lodge America's attorneys, Michael Huffman. Also appearing were several creditors, the United States Trustee's representative, and the BPU's attorney.

At the hearing, the BPU's attorney informed the court that his client would shut off the hotel's utilities the next morning at 8:00 A.M. if the hotel did not pay the $16,000 forthwith. Tenney informed the court that he knew a gentleman who would lend him the $16,000 and inquired whether it was acceptable for him to borrow the money personally and pay it to the BPU on the debtor's behalf. The court cautioned Tenney that if he wished to be repaid from the estate for such a payment, he would need advance court approval of the transaction.[6]

Later that day, Tenney convinced the BPU to delay cutting off the utilities if he paid the $16,000 by October 25, 1995. When this extended cutoff date arrived, Rudy Langer lent $16,000 to Lodge America, taking in return a promissory note dated October 25, 1995, due in 30 days. Langer then paid the loan proceeds directly to the BPU to apply to the hotel's utility bill. Had Lodge America not received the loan from Mr. Langer when it did, it would have ceased operations on October 25, 1995.

FFA members occupied 100 percent of the hotel's rooms at high rates. This enabled Tenney to keep the hotel in operation, pay other expenses, and repay Rudy Langer the $16,000 on November 8, 1995.

Lodge America continued to operate the hotel as a debtor-in-possession until November 28, 1996, when the court ordered the case converted to Chapter 7 and Eric C. Rajala became the Chapter 7 trustee.

## Discussion

■ Conceding that the loan transaction never "received actual, formal approval of the Court,"[7] Langer presents several arguments. His first argument concerns the so-called horizontal dimension test for determining § 364(a)'s ordinary-course-of-business condition. This test focuses on the practices of other companies in the same industry. Langer's argument regarding this test substitutes logic for proof. He observes that the hotel business is seasonal with periods of high and low rentals that necessarily require borrowing to pay expenses. This observation leads him to conclude that Lodge America was acting in the ordinary course of business in the hotel industry when it borrowed from him to pay its utilities. Although Langer's reasoning is appealing, it is not proof. The ordinary-course question is primarily one of fact, not of reason. Yet, the stipulation is silent about the borrowing practices of the hotel industry.

■ In addition to this dearth of proof, the propriety of applying the horizontal dimension test to determine the ordinary-course-of-business condition of § 364(a) has been undermined. One highly respected judge, the Honorable David Coar, convincingly argues that while the horizontal dimension test is appropriate for determining the ordinary-course-of-business exception to preference liability under § 547(c)(2), it is inappropriate for the § 364(a) analysis.[8] This court agrees.

Langer's second argument addresses the vertical dimension test for ordinary course under § 364(a), also called the creditor expectations test because it focuses on what a debtor's creditors normally expect it to do in the ordinary course of its business. Under this test, Langer continues

---

**6.** Exhibit no. 4 to Stipulation filed December 17, 1998 (Doc. # 36), partial transcript of hearing before the court on October 18, 1995, at 25–26.

**7.** Defendant's Trial Brief filed September 11, 1997 (Doc. # 24) at 5.

**8.** *Martino v. First National Bank of Harvey (In Matter of Garofalo's Finer Foods, Inc.),* 186 B.R. 414 (N.D.Ill.1995).

to rely on reason rather than proof. He suggests that since the debtor needed cash to keep its hotel operating, its creditors would have expected the borrowing and would have consented to a formal request to borrow money and repay it with estate funds. But since the stipulation is silent about the normal operations of Lodge America, no grounds exist to support a finding that Lodge America had borrowed in the past to supplement its cash flow. In short, Langer has adduced no evidence indicating that Lodge America's creditors had a basis in fact to expect that Lodge America would borrow, from either a bank or an individual, to pay its utilities.

■ Langer's next argument attempts to shield this transfer from avoidance under § 363(b)(1). The Code section permits a debtor to use, sell, or lease estate property in the ordinary course of its business without notice or a hearing. Part of the transaction here did involve a transfer protected by § 363(b)(1). When Langer lent money to Lodge America in return for a promissory note, the loan proceeds became property of the estate. Langer retained the loan proceeds briefly before paying them to the BPU to apply toward the utility debt. The loan proceeds belonged to the estate and were used to pay an ordinary-course expense of the debtor. Certainly Langer's payment of estate funds to the BPU was protected under § 363(b)(1) as an ordinary-course-of-business use of estate property that did not require court approval or notice to creditors. But the trustee's action here is not one to recover an ordinary-course-of-business payment of a utility bill to the BPU. Rather, it is an action to recover a transfer of estate property used to repay an unauthorized loan.

■ Finally, Langer argues that equity warrants *nunc pro tunc* approval of the loan and its repayment. That equity is evident from the stipulation and its exhibits showing Langer's innocence in completing the unauthorized loan. Tenney asked Michael Huffman, one of Lodge America's attorneys, if the loan had been approved and Huffman told him that it had been. On the strength of this information, Tenney represented to Langer that everyone was cooperating, that everything was in order, and that the court had approved the loan. Nothing in the stipulation suggests that Rudy Langer overreached or received any improper consideration for the loan. And Langer contends that if he had known the court had not approved the loan and that the paperwork had not been processed, he would have refused to make the loan to Lodge America.

In addition to these facts exonerating him, Langer justifies his request for *nunc pro tunc* approval with the loan's beneficial effect on the estate and his belief that the creditors and the court would have approved the loan if asked. Certainly Langer appears as an innocent actor in the transaction and, if equity could be applied, his good faith would entitle him to relief.

■ Unfortunately, equity cannot apply. Although it is a court of equity, a bankruptcy court cannot use its equitable powers to override explicit statutory mandates of the Bankruptcy Code.[9] This is true even though Langer has cited a Second Circuit Court of Appeals case, *American Cooler Co., Inc.*,[10] that supports his position. Unfortunately, this 1942 case is outdated. Referring to *American Cooler* and a companion case in *Martino*, Judge Coar correctly notes: "The persuasive authority of these decisions is questionable since Congress has substantially (and repeatedly) changed the nature and scope of the bankruptcy court's equitable powers in the

---

9. *In re Wood*, 87 B.R. 170 (Bankr.D.Kan. 1988); *See also Kahn v. Schigur (In re Kahn)*, 201 B.R. 285 (D.Kan.1996), *reversed on other grounds*, 133 F.3d 932, 1998 WL 17754 (10th Cir.1998).

10. 125 F.2d 496 (2nd Cir.1942).

intervening years."[11]  As Judge Coar concluded, this court believes its decision must turn on interpretation of the relevant statutes only.

■  One of those statutes, § 364(a), permits ordinary-course loans to a reorganizing debtor if lenders are willing to accept repayment as an administrative expense under § 503(b).  Normally, administrative expenses are not paid in a Chapter 11 case until distribution under a confirmed plan of reorganization.  In a Chapter 7 liquidation case, they are not paid until the trustee administers the estate and makes a distribution.  If a reorganization case is converted to a liquidation case, as was done here, the administrative expenses in the reorganization case become subordinate to those in the liquidation case, often resulting in delayed and diluted payment.[12]  In any event, whether in reorganization or liquidation, administrative expenses share pro rata in the available estate assets without favoritism to any single creditor unless the court otherwise allows.

In this case, however, Lodge America repaid the promissory note with estate property on November 8, 1995.  Langer therefore received payment in advance of other administrative expense creditors.  He also received priority over other administrative expense creditors without their having had an opportunity to object to the loan and its repayment terms.  Even if the court were to have found that this loan was made in the ordinary course of Lodge America's business, which it has not, such a finding would not justify immunizing the repayment transfer from avoidance under § 549(a)(2)(B).  The reach of § 364(a) does not extend to authorizing this loan or the transfer made to repay it.  It only authorizes a loan given in exchange for an administrative expense claim, subject to Code priorities and timing.

■  Finally, Langer's brief fails to address whether he is entitled to an unsecured, nonpriority claim.  Since the loan was outside the ordinary course of debtor's business and since § 364(a) does not authorize the transfer for § 549(a)(2)(B) purposes, the court finds Langer is entitled to an unsecured nonpriority claim in the amount of the repayment of $16,000.

### Conclusion

For the reasons stated, the court holds that (1) the horizontal dimension test of ordinary course of business does not apply to § 364(a); (2) Rudy Langer failed to show, under either the horizontal dimension test or the vertical dimension test applied under § 364(a), that Lodge America borrowed from him in the ordinary course of its business; (3) the ordinary-course-of-business provision of § 363(b)(1) authorizes the payment of utilities expenses to the Board of Public Utilities, but does not shield the loan repayment transfer of estate property from avoidance as a postpetition transfer of estate property; (4) equitable grounds will not permit Langer *nunc pro tunc* relief because specific Bankruptcy Code sections control the decision; (5) the provisions of § 549(a)(2)(B) were not rendered inoperative by those of § 364(a) because not only was the loan not made in the ordinary course of business, but § 364(a) does not authorize repayment of even an ordinary-course loan other than as an administrative expense under § 502(b)(1); (6) the loan repayment transfer is avoided under § 549(a) and Rudy Langer is hereby found liable under §§ 549(a) and 550(a) to repay $16,000 to the Lodge America, Inc., estate; and (7) upon paying this $16,000 liability to the Lodge America, Inc., Chapter 7 estate, Rudy Langer shall have an allowed unsecured nonpriority claim in that amount as authorized by § 502(d).

The foregoing discussion shall constitute findings of fact and conclusions of law

---

**11.**  *Martino,* 186 B.R. at 431 n. 10.

**12.**  11 U.S.C. § 726(b).

under FED.R.BANKR.P. 7052 and FED. R.CIV.P. 52(a). A judgment reflecting this ruling will be entered on a separate document in compliance with FED.R.BANKR.P. 9021 and FED.R.CIV.P. 58.

IT IS SO ORDERED.