**In re OCKERLUND CONSTRUCTION COMPANY, Debtor.**

No. 03 B 45189.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

April 7, 2004.

William L. Needler, Northbrook, IL, for Debtor.

Cole S. Kain, Chicago, IL, for Atlantic Mutual.

Heidi H. Rowe, Chicago, IL, for Midwesco Services.

### MEMORANDUM OPINION

JACQUELINE P. COX, Bankruptcy Judge.

The Chapter 11 debtor Ockerlund Construction Company ("Ockerlund") filed this case on November 5, 2003, after MB Fi-

nancial Bank unexpectedly set off the funds in one of its bank accounts to satisfy an overdue loan obligation. On November 17, 2003, but before these parties reached a settlement whereby the bank returned seized funds to the debtor's account, the debtor's president Craig Ockerlund provided certain "emergency advances" so that the Oakton Community School construction project could proceed smoothly and so that the post-petition premiums due on the employees' health and dental insurance could be paid. Chapter 11 debtor Ockerlund subsequently filed the instant "Debtor's Motion to Repay Administrative Advances to Debtor's Principal Officer" to obtain Court approval for repaying Craig Ockerlund the $58,764.74 he advanced on November 17, 2003. The motion further alleges that no opportunity for a "Priority Administrative Order" existed before Mr. Ockerlund made these advances but does not detail why a court order was impossible to obtain. At the hearing on March 10, 2004, one of the two bonding companies involved, Atlantic Mutual, and one other creditor, Midwesco Services, Inc., objected to this motion, while the bank MB Financial supported it. With Court approval, Atlantic Mutual began providing post-petition financing to Ockerlund after November 2003 and obtained the priority protections available under 11 U.S.C. § 364(c).

This dispute is a "contested matter" under Federal Rule of Bankruptcy Procedure 9014, and the Court has core jurisdiction over the same according to 28 U.S.C. § 1334(b) and § 157(b)(2)(D).

A first observation of this motion is that no procedure for the repayment of administrative advances exists *per se* under the Bankruptcy Code. A debtor-in-possession may use cash (other than "cash collateral") without court approval and notice to interested parties in the ordinary course of business, 11 U.S.C. § 363(c)(1), and it may use "cash collateral" with court or secured creditor approval subject to any restrictions imposed by whichever entity approves the use, 11 U.S.C. § 363(a), (c)(2), (e). Any unpaid post-petition expenses for goods and services may later qualify for priority "administrative expense" allowance in the bankruptcy case if they represent actual and necessary costs for preserving the value of the bankruptcy estate. 11 U.S.C. § 503(b), § 507(a). In all likelihood, the November expenditures related to this motion either were payments for post-petition business expenses made in the ordinary course of business or would have given rise to administrative-expense claims had the debtor not paid them.

The question raised in this dispute, though, is not whether the proceeds from Mr. Ockerlund's "advance" were used in the ordinary course of business or were spent to cover probable administrative expenses; rather, as Midwesco correctly points out, the question is whether this advance qualifies as a valid post-petition extension of credit to the debtor in accordance with 11 U.S.C. § 364(a)-(b). *See In re Lite Coal Min. Co.*, 122 B.R. 692, 695–96 (Bankr.N.D.W.Va.1990); *In re Massetti*, 95 B.R. 360, 363 (Bankr.E.D.Pa.1989). This provision states as follows:

(a) If the trustee is authorized to operate the business of the debtor under section 721, 1108, 1203, 1204, or 1304 of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.

(b) The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section

503(b)(1) of this title as an administrative expense.

11 U.S.C. § 364(a)-(b). If the $58,764.74 advance qualifies as a lawful extension of credit under § 364, the repayment thereof would receive administrative-expense priority in the bankruptcy case under § 503(b) and § 507(a). If the advance does not qualify as such, legal authorities are split on the lender's eligibility for repayment from the bankruptcy estate, as discussed *infra*.

The first problem with approving this "advance" as a post-petition extension of credit is that it has only been asserted to be a post-petition extension of credit after the fact. No promissory note evidencing the debtor's intent to repay the sum is before the Court, as in other cases interpreting § 364, *see, e.g., In re Lodge America*, 259 B.R. 728, 731, 734 (D.Kan.2001). Assuming, though, that the debtor construction company had an otherwise enforceable oral contract to borrow and repay money from its president without a negotiable instrument, the other dilemma presented by the motion is whether the debtor could have obtained the unsecured loan from its president without court approval after notice and hearing under § 364(a), or whether court approval after notice and hearing was required under § 364(b). The difference in this case will turn on whether the credit was obtained in the ordinary course of business, not on whether the credit funds were used or needed for § 503(b) administrative expenses, because the debtor did not secure prior court approval for the $58,764.74 advance. The so-called "emergency" need for funds to pay operating expenses nearly two weeks after the debtor filed this Chapter 11 case does not definitively answer the question of whether the $58,764.74 advance was an ordinary-course-of-business extension of credit. If anything, a true emergency would seem to indicate that a resort to out-of-the-ordinary-course means was necessary.

▮▮ To prove that an unsecured post-petition loan was obtained in the ordinary course of the debtor's business, the debtor must pass the "vertical" dimensions test.[1]

---

1. Other courts have additionally required the debtor to satisfy the "horizontal dimensions test" under which the debtor must show that the terms and circumstances of the extension of credit were consistent with the practices of the debtor's industry. *See In re Dant & Russell*, 853 F.2d 700, 704–05 (9th Cir.1988); *In re Poff Constr.*, 141 B.R. 104, 106–07 (W.D.Va.1991); *In re Lodge America*, 259 B.R. 728, 732 (D.Kan.2001).

Judge Coar in *Martino v. First Nat'l Bank (In re Garofalo's Finer Foods)*, 186 B.R. 414, 428–30 (N.D.Ill.1995), convincingly rejected this additional test as a matter of statutory construction. *See also In re Lodge America*, 239 B.R. 580, 583 (Bankr.D.Kan.1999), *affirmed*, 259 B.R. 728 (D.Kan.2001). *But cf. In re Husting Land & Development*, 255 B.R. 772, 779 (Bankr.D.Utah 2000), *affirmed*, 274 B.R. 906 (D.Utah 2002). To summarize, the ordinary-course-of-business defense to a preference action under § 547(c)(2) contains two so-called "subjective" elements requiring the creditor to show that (1) the antecedent credit extension at issue and (2) the debtor's preferential payment thereon both occurred in the ordinary course of business transactions that had developed between the debtor and the particular creditor-defendant at issue. *See id.* at 428. A third "objective" element requires the creditor to show that the payment terms under which the debtor made the preferential payment were consistent with industry-wide billing and payment practices. 11 U.S.C. § 547(c)(2)(C); *In re Tolona Pizza Products Corp.*, 3 F.3d 1029, 1031 (7th Cir.1993).

By contrast, when a debtor-in-possession obtains unsecured post-petition credit without court approval under § 364(a), it does not need to establish the last two elements (including § 547(c)(2)(C)); rather, the statute only requires it to show that the debt has been incurred in a typical fashion when compared to the debtor-in-possession's own historical practice. *See Matter of Garofalo's Finer Foods*, 186 B.R. 414, 429 (N.D.Ill.1995). In other words, only the overlapping language of

Under this test, the Court examines the reasonable expectations of creditors in light of their past relationship with the debtor and its incurrence of debt, including the amount, terms, frequency, sources, and timing of pre-petition extensions of credit from various sources. *See In re Poff Constr.*, 141 B.R. 104, 106 (W.D.Va.1991); *In re Lodge America*, 259 B.R. 728, 732 (D.Kan.2001); *Matter of Garofalo's Finer Foods*, 186 B.R. 414, 425–27 (N.D.Ill.1995). "This showing is required merely to assure that neither the debtor nor the creditor did anything abnormal to gain an advantage over other creditors," *In re Lodge America*, 259 B.R. 728, 732 (D.Kan.2001), and to ensure that creditors are not being subjected to different economic risks than those for which they bargained at the inception of the debtor-creditor relationship, *see Martino v. First Nat'l Bank (In re Garofalo's Finer Foods)*, 186 B.R. 414, 424–26 (N.D.Ill.1995). In *Garofalo's*, for instance, the district court partially reversed the bankruptcy court's finding that all of the bank's post-petition extensions of overdraft credit were outside the ordinary course of business, remanding the case for the bankruptcy court to decide at what point in time the overdraft credits ceased being similar enough in both frequency and amount to the relevant pre-petition course of conduct to qualify for priority

protection under § 364(a). *See id.* at 426–27.

■ The present motion, assuming all statements contained therein are true, does not satisfy the "vertical" dimension standard. It contains an argument concerning why the debtor needed an emergency advance of funds two weeks after it filed this case, but it does not argue that the debtor incurred the post-petition debt in the ordinary course of business, and, indeed, no evidentiary record exists to support this conclusion. *Cf. In re Lodge America*, 259 B.R. 728, 733 (D.Kan.2001) (no evidence debtor had ever before obtained short-term financing to pay utility bills); *In re Lodge America*, 239 B.R. 580, 583–84 (Bankr.D.Kan.1999), *affirmed*, 259 B.R. 728 (D.Kan.2001).

■ If a debtor fails to establish that post-petition financing occurred in the ordinary course of business under § 364(a), some courts find that retroactive approval (a *"nunc pro tunc"* order) under § 364(b) and § 105(a) is possible but should be reserved for truly extraordinary and unusual circumstances, *cf. In re Massetti*, 95 B.R. 360, 364 (Bankr.E.D.Pa.1989); *In re Lehigh Valley Professional Sports Clubs*, 260 B.R. 745, 750–51 & n. 13 (Bankr.E.D.Pa. 2001); *In re Blessing Industries*, 263 B.R. 268, 274 (Bankr.N.D.Iowa 2001),[2] although

---

§ 364(a) and § 547(c)(2) requires a consistent interpretation, while the omission of language in § 364(a) that is present in § 547(c)(2) implies that Congress did not intend for bankruptcy courts to look at the business practices of other similar operations in the case at bar. Indeed, such a requirement creates a great hassle that is likely to produce redundant information. *See id.*

**2.** The *Blessing Industries* court's commentary is instructive in the case at bar:

Despite the finding that no creditors were actually harmed by the unauthorized financing, Bolger has failed to demonstrate that extraordinary circumstances existed

which prevented it from following the explicit mandates of the Bankruptcy Code. Bolger claims that the funds were needed immediately and that it did not have time to seek court approval. However, the Court finds that this argument is not persuasive. Ten days passed from the initial discussions of the possible cash infusion until the funds were actually expended. The Bankruptcy Code provides for an expedited hearing in cases of emergency, and often a hearing can be scheduled as early as the next day. See Fed. R. Bankr.P. 4001(c).

Serious questions of due process exist in circumstances such as this. "Due process requires that interested parties have mean-

other courts go so far as to say that the case law under the 1898 Bankruptcy Act countenancing retroactive approval on equitable grounds has been eviscerated under the current Bankruptcy Code, *see In re Lodge America*, 259 B.R. 728, 734–35 (D.Kan.2001); *Bezanson v. Indian Head National Bank (In re J.L. Graphics)*, 62 B.R. 750, 755 (Bankr.D.N.H.1986), *aff'd, In re Cross Baking Co.*, 818 F.2d 1027 (1st Cir.1987). The latter view is more in tune with controlling authority for this district. The Bankruptcy Court's equitable powers under 11 U.S.C. § 105(a) do not override specific Bankruptcy Code provisions; they supplement those provisions and fill in gaps and ambiguities, as the Seventh Circuit most recently noted in *In re Kmart Corp.*, 359 F.3d 866, 871–72 (7th Cir.2004). *See also Levit v. Ingersoll Rand Fin. Corp.*, 874 F.2d 1186, 1197–98 & n. 10 (7th Cir.1989) (" 'There is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted.' ... Bankruptcy laws are not special cases, as *Ahlers* demonstrates.") (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978)); *Martino v. First Nat'l Bank (In re Garofalo's Finer Foods)*, 186 B.R. 414, 431–35 (N.D.Ill.1995) (rejecting plea for equitable relief in spite of alleged benefit the estate received from post-petition overdraft credits, because the setoff of bank-account deposits was clearly unauthorized under the Code); *In re Lodge America*, 259 B.R. 728, 734–35 (D.Kan.2001) (quoting *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988)); *In re Lodge America*, 239 B.R. 580, 584

(Bankr.D.Kan.1999), *affirmed*, 259 B.R. 728 (D.Kan.2001). As to gaps and ambiguities in § 364 itself, the scheme Congress envisioned as a whole covers all post-petition financing situations (i.e., those in and out of the ordinary course of business) and would be incapacitated by retroactive approval of the ones demanding prior approval and notice to creditors; notice after a debtor has already taken action is generally not meaningful. *See Martino v. First Nat'l Bank (In re Garofalo's Finer Foods)*, 186 B.R. 414, 431 n. 10 (N.D.Ill.1995); *In re Lodge America*, 259 B.R. 728, 735 (D.Kan.2001). Bankruptcy Rule 4001(c) gives structure to this prior-notice requirement, contemplating prior court approval only after sending a required 15–day notice to the committee of unsecured creditors or to the 20 largest non-insider unsecured creditors. Interim approval on more limited notice under Bankruptcy Rule 4001(c)(2) is permitted pending a final hearing complying with this rule, but even this option requires prior court approval after the debtor either sends at least a two-day notice to parties in interest or presents a same-day affidavit showing cause for an emergency *ex parte* hearing. *See* Local Bankruptcy Rules 5096–1, 9013–3 to –4.

■ A final lingering question is whether the $58,764.74 advance, having not qualified for administrative-claim priority under § 364, is still eligible for treatment as a general unsecured claim or is not eligible for any distribution at all. Courts have come to different conclusions on this issue. *Compare In re Lodge America*, 239 B.R. 580, 585 (Bankr.D.Kan.1999), *affirmed*, 259 B.R. 728 (D.Kan.2001); *Martino v. First*

---

ingful notice with adequate opportunity to object." *In re Commercial Millwright Service Corp.*, Bankr.No. 95–60007KW, slip op. at 2 (Bankr.N.D.Iowa Sept. 15, 1995). When parties attempt to keep a company afloat while disregarding procedural safe-

guards, the underlying purposes of the Code is frustrated. At minimum, due process requires that other interested parties have notice of the transaction.
*In re Blessing Industries*, 263 B.R. 268, 274 (Bankr.N.D.Iowa 2001).

*Nat'l Bank (In re Garofalo's Finer Foods),* 186 B.R. 414, 423, 435 (N.D.Ill.1995); *In re Massetti,* 95 B.R. 360, 366 n. 9 (Bankr. E.D.Pa.1989); *In re Smith,* 72 B.R. 344, 351 (Bankr.S.D.Ohio 1987) (granting equitable lien in place of a valid § 364(c) lien), *affirmed,* 119 B.R. 558 (S.D.Ohio 1989); *In re John Deskins Pic Pac,* 59 B.R. 809, 812 (Bankr.W.D.Va.1986) *with Matter of Alafia Land Development Corp.,* 40 B.R. 1, 5 (Bankr.M.D.Fla.1984). None of these decisions contains a substantial discussion of the Bankruptcy Code's actual language concerning what constitutes a general unsecured claim. Most of them instead cite *Collier on Bankruptcy, see* 3 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 364.03[2], at 364–8 (15th ed. rev.2003), to support awarding the post-petition lender general-unsecured-claim status. *Collier on Bankruptcy* in actuality concedes the issue might be resolved both ways but declines to discuss the problem in detail, *see id.,* as no published decision apparently has done so.

▮ This Court concludes that the *Alafia Land Development* case has the view that is more consistent with the statute. The definition of "claim" under the Bankruptcy Code is, to be sure, broad enough to encompass an unauthorized post-petition loan such as the one at issue. *See* 11 U.S.C. § 101(5). Nevertheless, the definition of who is a "creditor" usually requires a right to payment from (or a "claim against") the debtor on or before the order for relief (the petition date in a voluntary case), *see* § 101(10), and only a "creditor" is entitled to file a "proof of claim" in a bankruptcy case, *see* § 501. Further,

proofs of claims are "determined" and "allowed" in an "amount . . . as of the date of the filing of the petition," § 502(b), unless an explicit exception applies, *see* § 502(f)-(i).[3] Thus, a holder of a post-petition "claim" that is not entitled to administrative-expense priority cannot be a creditor, cannot file a proof of claim, and, even if he could file one, cannot by definition have an "allowed" claim as of the petition date.

▮ These basic limitations have ramifications in Chapter 11 cases. A holder of a post-petition "claim" that is not entitled to administrative-expense priority will not have class voting rights on account of an "allowed" general unsecured claim, *see* § 1123(a)(1), § 1126(a), (c), § 1129(a)(8), (10), and will also not be able to demand the following plan distributions from the bankruptcy estate by posing an objection to confirmation:

- a distribution equal to the present value of what it would have received for an "allowed unsecured claim" in a Chapter 7 liquidation case, *see* § 1129(a)(7)(A), § 726(a)(2), § 501,
- a cash distribution equal to what would have been an "allowed administrative expense" had it complied with § 364(b), *see* § 1129(a)(9)(A), § 503(b)(1), § 507(a)(1), and
- a distribution equal to the present value of the full "allowed amount of such claim," unless all junior claims and interests receive nothing in a cramdown scenario (the absolute-priority rule), *see* § 1129(b)(2)(B), § 502(b).

Ockerlund Construction Company could technically propose a Chapter 11 plan with

---

**3.** Technically speaking, a claim that has been filed is deemed "allowed" under § 502(a) until an interested party objects and the bankruptcy court sustains this objection under § 502(b). We have not yet reached a point at which the company president Mr. Ockerlund has filed a proof of claim subject to a credi-

tor's objection. Nevertheless, if such a proof of claim were filed in this case, the Court assumes that Atlantic Mutual and Midwesco Services would lodge objections that are similar to their present objections to the allowance of Mr. Ockerlund's post-petition financing as an administrative expense.

a separate class of "claims" for unsecured post-petition debts that fail to qualify for administrative-expense priority, leaving this class "unimpaired" by providing for full and timely repayment of principal and interest. (A plan proponent can apparently create "unimpaired" classes of "claims" without regard for the claimant's qualification as a "creditor" or as an "allowed" claimant.[4] *See* 11 U.S.C. § 1122(a), § 1123(a)(2), § 1124.) If such a plan proceeded to a cramdown confirmation hearing, though, a general unsecured creditor belonging to a class that receives less than full payment would have a sustainable objection due to the unfair discrimination in favor of an insider claim that otherwise holds equal priority under nonbankruptcy law. *See* 11 U.S.C. § 1129(b)(1); *In re Woodbrook Associates*, 19 F.3d 312, 321 (7th Cir.1994); *In re Aztec Co.* 107 B.R. 585, 588–91 (Bankr.M.D.Tenn.1989); 7 Lawrence P. King et al., *Collier On Bankruptcy* ¶ 1129.04[3][b][ii]-[v], [ix], at 1129–74 to 1129–79 (15th ed. rev.2003).[5] Other scenarios could evolve permitting some type of dividend for a post-petition general unsecured "claim" along with pre-petition general unsecured claimants, such as when all impaired classes "accept" a Chapter 11 plan and no individual creditor presents a valid objection to confirmation. 11 U.S.C. § 1126(c)-(d), § 1128(b), § 1129(a) (criteria for confirmation when every class of claims and interests has either accepted the plan or is unimpaired). Until that scenario presents itself, though, the Court has no apparent authority in light of the language and structure of the Bankruptcy Code to create some type of post-petition general

unsecured claim for loans that fail to qualify for priority under § 503(b) and § 507(a)(1).

In the final scheme of things, the Court's conclusion on this last issue will not be as harsh as it first appears if this Chapter 11 case is administratively insolvent, leaving general unsecured claimants without a dividend anyway.

### Conclusion

For the foregoing reasons, the objections of Atlantic Mutual and Midwesco Services are sustained, and the "Debtor's Motion to Repay Administrative Advances to Debtor's Principal Officer" is denied.

---

**4.** These "unimpaired" classes do not vote for or against a plan because the law conclusively presumes that they accept it. 11 U.S.C. § 1126(f), § 1129(a)(8).

**5.** "[A] plan proponent may pay classes of claims different amounts if there is a non-bankruptcy rationale for doing so, and if the

discrimination is tailored to the nonbankruptcy rationale.... Unfair discrimination works ... among claimants of equal nonbankruptcy priority." 7 Lawrence P. King et al., *Collier On Bankruptcy* ¶ 1129.04[3][b][v], [ix], at 1129–76, 1129–79 (15th ed. rev.2003).